UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SEAN FELDER,                                           :

                          Plaintiff,                   :
                                                           04 Civ. 9501 (LAK)(FM)
          _____
                     -against-                         :

SECURTICUS SECURITY SERVICES,        :        **REPORT AND**
                                              **RECOMMENDATION**
                          Defendant.          :        **TO THE HONORABLE**
                                              **LEWIS A. KAPLAN**
------------------------------------------------------------x

SEAN FELDER,                                           :

                          Plaintiff,                   :        05 Civ. 3141 (LAK)(FM)

                     -against-                         :

McROBERTS PROTECTIVE AGENCY,           :

                          Defendant.                   :

------------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.        Introduction

          Plaintiff Sean Felder ("Felder") brings these pro se employment

discrimination actions against the defendants, Securitas Security Services, incorrectly

named as Securticus Security Services ("Securitas"), and McRoberts Protective Agency

("McRoberts"), alleging discrimination and retaliation on the basis of his race, in violation

of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.§ 2000e,     et seq.

Following the close of discovery, each defendant has moved for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (See 04 Civ. 9501, Docket

Nos. 24-26; 05 Civ. 3141, Docket Nos. 20-21).  For the reasons set forth below, the

defendants' motions for summary judgment should be granted.

II.    Background

Unless otherwise noted, the following facts either are undisputed or are set

forth in the light most favorable to Felder.

A.    Relevant Facts

1.    Felder's Protected Status

Felder is an African American male.  (Securitas Am. Compl. ¶¶ 7-8;

McRoberts Am. Compl. ¶¶ 7-8).

2.    Felder's Attempt to Obtain Employment at Securitas

On March 3, 2003, Felder and his friend Nevin Reid applied to Burns, Inc.

("Burns"), Securitas' predecessor in interest, for seasonal security guard positions at

Yankee Stadium.  (Securitas Am. Compl. ¶ 8).  Despite having "qualifications," Felder

"was told by a staff member that [he had] failed a survey test."  (Id.).  Securitas and

apparently also Burns required all job applicants to take and pass an exam, known as the

Stanton Survey, which is "a pre-employment psychological test . . . measur[ing] honesty,

willingness to comply with company policies and an individual's proclivity toward theft

and misuse of company time."  (See Decl. of Christine Hirschl, Esq., dated Feb. 2, 2006

2

("Hirschl Decl."), ¶¶ 1, 9). It therefore appears that the "survey test" Felder refers to in the Amended Complaint is the Stanton Survey. (Securitas Am. Compl. ¶ 8). Felder further alleges that "a Hispanic wom[a]n [he] knew took the test with no license [and] got the job." (Id.). Securitas, however, does not require job applicants to be licensed security guards when applying for security guard positions. (Hirschl Decl. ¶ 8).

Securitas has no record of Felder applying for a security guard position with Burns or Securitas on March 3, 2003, or at any other time. (Id. ¶ 5). Securitas nevertheless maintains statistical reports concerning Burns' "new hires." (See id. Ex. A). According to these reports, out of the 108 employees hired for security guard positions at Yankee Stadium between January 2003 and September 17, 2003, eighty were Black, seven were Hispanic, and three were Asian. (Id.). Stated as a percentage, seventy-four percent of the security guards hired by Burns during this time period were African American. This hiring is consistent with Burns' published employment opportunity policy which states that Burns "will recruit, hire, train and promote persons in all job titles without regard to race." (Id. Ex. B at 5).

> 3.  McRoberts

>> a.  Felder's Employment at McRoberts

McRoberts' business consists of providing its customers with security guards, greeters, and other security staff. (Aff. of Timothy Crandell, sworn to on Dec. 14, 2005 ("Crandell Aff."), ¶ 2). On or about January 20, 2004, McRoberts hired Felder on a

temporary basis.  (See Def.'s R. 56.1 Stmt. ¶¶ 1-2; Aff. of Felice B. Ekelman, Esq., sworn

to on Dec. 12, 2005 ("Ekelman Aff."), Ex. A (Dep. of Sean Felder, taken on Oct. 17, 2005

("Felder Dep.")), at 59; Crandell Aff. ¶¶ 3-4).  Eight days later, on January 28, 2004,

Felder worked his first assignment for McRoberts as a security guard for a Gift Show at

the Jacob Javits Convention Center.  (See Ekelman Aff. Ex. B; Crandell Aff.      ¶ 4).

From January 28 until March 27, 2004, Felder worked twenty-one shifts

as a security guard and two as a greeter.  (See Ekelman Aff. Ex. B).  Felder was paid at the

rate of $7.00 per hour as a security guard and $10.00 per hour as a greeter.  (Felder Dep. at

97).  Most of the greeters were white.  (Id.).

On April 10, 2004, only one hour before his scheduled security shift, Felder

called McRoberts' "dispatch" and told the operator on duty that he was unable to work

that day.  (Crandell Aff. ¶ 10 & Ex. B).  This violated McRoberts' "call-off" policy which

requires employees to contact a dispatcher at a toll-free phone number at least four hours

in advance to cancel their shifts.  (Crandell Aff. ¶ 8).  McRoberts' Employee Handbook,

describes "[f]ailure to notify a dispatcher when unable to report to work, or canceling work

with less than [four] hours' notice" as acts which violate the company's Code of Conduct

and which can "lead to disciplinary action . . . including discharge."  (Id. Ex. A at 10-11).

Although Felder denies having received a copy, it is McRoberts' practice to distribute its

Employee Handbook to all employees at the time of hiring and to inform them about the

company's four-hour call-off policy.  (Felder Dep. at 73; Crandell Aff.   ¶¶ 7-8).

Following his untimely call, Felder was removed from McRoberts' work schedule and told to return his uniforms to McRoberts on April 12, 2004. (Crandell Aff. Ex. B). Felder evidently did not comply. Instead, he sent McRoberts a letter dated April 14, 2004, in which he threatened to "report <u>McRoberts</u> to the Human Rights Division" and file a lawsuit. (<u>See</u> Ekelman Aff. Ex. C at 1-2) (emphasis in the original). Thereafter, Felder met with McRoberts' managers Tony Rivera and "Rock," who told him that there had been a misunderstanding, and that he had not been terminated. (Felder Dep. at 45-47). Following this meeting, Felder resumed his employment with McRoberts. From at least May 16 through May 19, 2004, Felder worked as a greeter at a trade show, for which he was paid $10.00 per hour. (Ekelman Aff. Ex. B).[1]

On May 28, 2004, William Dougherty ("Dougherty"), who was then Vice President of McRoberts' New York Branch, offered Felder a full-time security guard position at 502 Park Avenue, which he accepted. (Crandell Aff. ¶ 13; Felder Dep. at 67-68). Although Felder considered Dougherty "kind of sarcastic" and "a little arrogant" in explaining the details of the new assignment, he concedes that Dougherty did review McRoberts' call-off policy with him at the time. (Felder Dep. at 50-52).

Felder's first scheduled tour as a full-time security guard at 502 Park

---

[1]     For the preceding four days, Felder also worked as a security guard at the show. (<u>See</u> <u>id.</u>).

Avenue was on June 2, 2004, when he was expected to work from 9 a.m. to 5 p.m.

(Crandell Aff. ¶¶ 14-15).  On that morning, at approximately 8:15 a.m., Felder advised

McRoberts' dispatcher Maria Rodriguez ("Rodriguez") that he could not report to his post

because he was in South Carolina caring for his ailing grandmother.  (Felder Dep. at 75-

76; Def.'s R. 56.1 Stmt. ¶ 38).  According to Felder, Rodriguez was "nasty" and told him

that he had "violated company policy."  (See Felder Dep. at 79).  Following Felder's call,

McRoberts hastily arranged for Leonard Falcone, who normally worked a shift starting at 5

p.m., to cover for Felder.  (Crandell Aff. ¶ 18).  However, due to the short notice, Falcone

was not able to report to 502 Park Avenue until 11 a.m.  (Id. ¶ 19).

   Later that same day, Felder's mother, Leatrice Toddman, called McRoberts'

office to explain that Felder needed time off to take care of his grandmother in South

Carolina.  (Felder Dep. at 80-81).  Thereafter, Felder missed three additional work shifts at

502 Park Avenue without contacting McRoberts.  (Id. at 91-92; Crandell Aff. ¶ 20).

Felder returned to New York on June 8, 2004, but did not contact McRoberts then

because he "had too much on [his] mind."  (Felder Dep. at 90-91).

   By letter dated June 7, 2004, Felder wrote to McRoberts' Human Resources

Department to complain about McRoberts' lack of concern regarding his grandmother's

condition.  (Ekelman Aff. Ex. D).  In his letter, Felder stated:

> I don't appreciate no one getting nasty with my mother and I
> can call the Labor Dept and file a complaint.  Now if I'm
> terminated, please mail me my seperation [sic] of notice to

> give to the Dept of Labor plus I have <u>no</u> <u>problem</u> taking legal
> action!

(<u>Id.</u>) (emphasis in the original).

Felder claims to have spoken with Shannell Garey, McRoberts' Human Resources Manager on June 9, 2004, at which time she confirmed receipt of his letter and informed him that he was terminated effective that day. (Felder Dep. at 88-89, 93). McRoberts has no record of such a phone call and denies that it occurred. (Crandell Aff. ¶ 22 & Ex. B). In any event, McRoberts also has produced an entry from the McRoberts' Employee Diary dated June 16, 2004 which reads:

> be advised . . . [F]elder has not come into the office or called to
> find out the status of his employ[ment]. [T]he last incident in
> which . . . [F]elder has made [contact] was on [June 2, 2004] a
> no call/no show which is against co[mpany] policy. [H]e has
> been unreachable, he was told of office [management]
> wanting to speak with him as well as would like to receive
> back [company] property.  Mc[R]oberts is still awaiting his
> response/call back.  At this present time we have considered
> his status a job abandonment.

(<u>Id.</u> Ex. B).

Felder subsequently was replaced at 502 Park Avenue by Michael Kingston, an African American male. (Crandell Aff. ¶ 23).

b.     Denial of Employment Benefits

Felder filed an application for unemployment benefits, which was denied by the New York State Department of Labor ("DOL") on the basis that he voluntarily left his employment at McRoberts without good cause.  (Id. ¶ 24; Ekelman Aff. Ex. H).  The DOL denied subsequent requests for unemployment benefits on August 18 and 24, 2006.  (Crandell Aff. ¶¶ 25-26).  Thereafter, Felder requested and was granted an administrative hearing which took place on September 13, 2004, before Administrative Law Judge Elizabeth T. Nicolato.  (Id. ¶ 27).  At the hearing, Dougherty and Rodriguez testified.  (Id. ¶ 28; Def.'s R. 56.1 Stmt. ¶ 38).  Thereafter, the Unemployment Insurance Appeal Board denied Felder's appeal on January 6, 2005.  See Felder v. McRoberts, 21 A.D.3d 1175, 1176 (3d Dep't 2005).

On September 15, 2005, the Appellate Division, Third Department, affirmed the Appeal Board's denial of unemployment benefits, stating that "[i]nasmuch as [Felder] failed to contact the employer in a timely manner after his absence or take other reasonable steps to protect his employment, . . . the Board's decision that [Felder] abandoned his job is supported by substantial evidence."  Id.  Felder filed an application for leave to appeal to the Court of Appeals which was denied on November 25, 2005.  (Ekelman Aff. Ex. I).

8

B.      Relevant Procedural History

1.      Securitas

a.      Administrative Proceedings

On March 10, 2003, Felder filed an administrative complaint against Securitas with the New York State Division of Human Rights ("NYSDHR"), in which he alleged that its hiring practices were discriminatory.  (Hirschl Decl. ¶ 7).  It appears that Felder also dual filed his complaint with the federal Equal Employment Opportunity Commission ("EEOC").  (See Decl. of Deke W. Bond, Esq., dated Feb. 3, 2006, Ex. 4).  On December 11, 2003, the NYSDHR issued a Determination and Order dismissing Felder's complaint because there was "no probable cause to believe that [Securitas had] engaged in or is engaging in the unlawful discriminatory practice complained of."  (Id. Ex. 3 at 1).  The NYSDHR further determined that:

> For the position for which [Felder] applied, [Burns] hired  80 Black workers and a total of 28 workers of all other races combined.  In other words, almost three times as many Black applicants were hired as applicants of all other races combined. These figures do not support [Felder's] contention that [Burns] did not hire him because of his race.

(Id.).  Finally, the NYSDHR noted that the "extensive" material it had received concerning the test that Burns administered failed to show that it was racially discriminatory.  (Id. at 1-2).

9

On February 4, 2005, the EEOC adopted the NYSDHR's findings, dismissed Felder's Charge of Discrimination, and issued him a Right to Sue letter.  (Id. Ex. 4).

    b.  <u>Federal Action</u>

Felder's original Complaint in the <u>Securitas</u> action is dated April 30, was received by the <u>Pro Se</u> Office of this Court on May 6, and was filed on December 3, 2004. (<u>See</u> Docket No. 2 at 1).  By order dated December 3, 2004, Chief Judge Mukasey granted Felder's request to proceed <u>in forma pauperis</u> against Securitas, but directed him to amend his Complaint within sixty days.  (Docket No. 3).

Felder filed his Amended Complaint on January 5, 2005.  (Docket No. 4). On February 28, 2005, the case was reassigned to Your Honor.  (Docket No. 6).  By order dated August 2, 2005, the case was referred to me for general pretrial supervision and to report and recommend with respect to any dispositive motions.  (Docket No. 12). Securitas then filed its motion for summary judgment on or about February 3, 2006. (Docket Nos. 24-26).  Despite the passage of six months, Felder has not filed any opposition papers.

2.      McRoberts

a.      Administrative Proceedings

On June 14, 2004, Felder filed an administrative complaint with the

NYSDHR, in which he alleged that he was "terminated because of [his] race."  (Ekelman

Aff. Ex. E at 2).  On September 27, 2004, the NYSDHR issued its determination that

there was "no probable cause to believe that [McRoberts had] engaged in or is engaging in

the unlawful discriminatory practice complained of."  (Id. Ex. F at 1).  That same day,

Felder filed a Charge of Discrimination against McRoberts with the EEOC.  (McRoberts

Am. Compl. ¶ 10).  On October 20, 2004, the EEOC dismissed the Charge and issued a

Right to Sue letter to Felder, stating that it was unable to conclude that McRoberts had

violated the law and, therefore, had adopted the findings of the NYSDHR.  (See Ekelman

Aff. Ex. G).

b.      Federal Action

Felder's original Complaint against McRoberts is dated January 10, was

received by the Pro Se Office on January 20, and was filed on March 23, 2006.  (See

Docket No. 2 at 1).  By order dated March 23, 2005, Chief Judge Mukasey granted

Felder's request to proceed in forma pauperis against McRoberts, but directed him to

amend his Complaint within sixty days because it failed to allege any facts demonstrating

discriminatory conduct by McRoberts.  (Docket No. 4).

11

After Felder filed his Amended Complaint on April 8, 2005, (Docket No. 5), the case was reassigned to Your Honor on April 29, 2005. (Docket No. 6).[2]  On August 2, 2005, the case was referred to me for general pretrial supervision and to report and recommend with respect to any dispositive motions. (See Docket No. 13). On or about December 13, 2005, McRoberts filed its motion for summary judgment. (Docket Nos. 20-21). Once again, despite the passage of more than six months, Felder has not filed any opposition papers.

III.    Discussion

     A.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In deciding a motion for summary judgment, the court must "view the

---

[2]    The Amended Complaint contains a recitation of facts which ends midsentence with an arrow suggesting that Felder intended to continue overleaf or on an insert. (See Docket No. 5). However, the Amended Complaint contains no additional facts in support of Felder's claims. (Id.).

evidence in the light most favorable to the party against whom summary judgment is sought and . . . draw all permissible inferences in favor of that party." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material. See Kulak v. City of New York, 88 F.3d 63, 70 (2d Cir. 1996). Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court. Fischl, 128 F.3d at 55. See also Fed. R. Civ. P. 56(e) 1963 advisory committee's note. Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." Fischl, 128 F.3d at 55.

        To defeat a motion for summary judgment, the non-moving party cannot merely rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

        The Second Circuit has cautioned that summary judgment is often inappropriate in cases where the trier of fact will have to delve into an employer's intent, because intent is an issue as to which direct evidence is rarely available. See, e.g., Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994); Patrick v.

13

LeFevre, 745 F.2d 153, 159 (2d Cir. 1984).  However, when an employer has explained

its conduct and the plaintiff has offered only conclusory assertions in opposition, summary

judgment may be granted.  See, e.g., Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)

("To allow a party to defeat a motion for summary judgment by offering purely conclusory

allegations of discrimination, absent any concrete particulars, would necessitate a trial in all

[discrimination] cases.").

        Here, of course, Felder has not submitted any evidence in opposition to the

defendants' summary judgment motions.  Nonetheless, "the failure to oppose a motion for

summary judgment alone does not justify the granting of summary judgment.  Instead, the

district court must still assess whether the moving party has fulfilled its burden of

demonstrating that there is no genuine issue of material fact and its entitlement to

judgment as a matter of law."  Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d

241, 244 (2d Cir. 2004).  While the Court can grant special latitude to Felder because he is

pro se, he cannot rely on conclusory allegations and must, instead, adduce evidence to

defeat the motion in order to prevail.  See Viruet v. Citizen Advice Bureau, No. 01 Civ.

4595 (AJP), 2002 WL 1880731, at *9 (S.D.N.Y. Aug. 15, 2002).

      B.     Title VII

        Title VII provides, in relevant part:

        It shall be an unlawful employment practice for an employer –
        (1) . . . to discharge any individual, or otherwise to
        discriminate against any individual with respect to his

> compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or
> national origin.

42 U.S.C. § 2000e-2(a).

In assessing the sufficiency of a Title VII claim, a court must apply the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973), and its progeny.  Under that rubric, the plaintiff must satisfy an initial burden of "proving by a preponderance of the evidence a prima facie case of discrimination."  <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981).  To establish a <u>prima facie</u> case, an employee must show that: (1) he was within the protected class; (2) he was qualified for the job; (3) he was subjected to an adverse employment decision or discharge; and (4) the adverse action occurred under circumstances giving rise to an inference of race discrimination.  <u>See</u> <u>Stratton v. Dep't For the Aging</u>, 132 F.3d 869, 879 (2d Cir. 1997); <u>Stetson v. Nynex Service Co.</u>, 995 F.2d 355, 359 (2d Cir. 1993).

Once the plaintiff makes out a <u>prima facie</u> case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for the employment decision."  <u>Stratton</u>, 132 F.3d at 879.  The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the

15

difficulty of proving discriminatory intent."  <u>Fisher v. Vassar College,</u> 114 F.3d 1332,

1335-36 (2d Cir. 1997) (<u>en banc</u>).

Finally, if the defendant provides a nondiscriminatory rationale for its

conduct, the rebuttable presumption drops out of the case.  <u>St. Mary's Honor Ctr. v. Hicks</u>,

509 U.S. 502, 510-11 (1993).  The burden then rests on the plaintiff to prove not only that

the proffered nondiscriminatory reason was pretextual, but also that the defendant

discriminated against the plaintiff.  <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87,

91 (2d Cir. 2001).

C.    <u>Retaliation</u>

Under Title VII, it also is unlawful for an employer to retaliate against an

employee who has exercised his statutory right to complain about conduct that he

considers discriminatory.  <u>See id.</u> at 94.  A retaliation claim is "not dependent on the merits

of the underlying discrimination complaint."  <u>Davis v. State Univ. of New York</u>, 802 F.2d

638, 642 (2d Cir. 1986).  Thus, to establish a <u>prima facie</u> case of retaliation under Title

VII, an employee must show that:  (1) he engaged in a protected activity; (2) the employer

knew of this activity; (3) the employer took adverse action against the employee; and (4)

there was a causal relation between the adverse action and the employee's protected

activity.  <u>See Cifra v. Gen. Elec. Co.</u>, 252 F.3d 205, 216 (2d Cir. 2001); <u>Holt v. KMI-

Cont'l, Inc.</u>, 95 F.3d 123, 130 (2d Cir. 1996).  The last of these elements can be

established: (a) "<u>directly</u> through evidence of retaliatory animus directed against a plaintiff

16

by the defendant;" or (b) "indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct . . ." DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted) (emphasis in the original).

Once a prima facie showing has been made, an employee's retaliation claim is subject to the McDonnell Douglas burden-shifting analysis. Consequently, if the employer furnishes a legitimate nondiscriminatory reason for the contested action, the burden of persuasion shifts to the employee, who must "demonstrate that there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 443 (2d Cir. 1999).

D.      Application of Law to Facts

1.      Securitas

In the Securitas action, Felder apparently alleges that Burns' failure to hire him for a temporary security guard position was racially discriminatory. (See Securitas Am. Compl. ¶¶ 4, 8). However, Felder admits to having been advised that he failed the hiring test that is a requirement for employment with the company. (Id. ¶ 8). Since there is no reason to believe that Felder, in fact, passed the test, he has failed to show that he was qualified for the job he sought.

17

Moreover, there is no evidence that Felder was turned down under circumstances that give rise to an inference of race discrimination.  The only evidence that Felder has been able to muster in support of his claim is that an unnamed "Hispanic wom[a]n . . . took the test with no license [and] got the job."  (Id.).  In the absence of any evidence that Felder passed the test, he cannot show that he was treated differently than the Hispanic woman on the basis of his race.  Indeed, notwithstanding the test, seventy-four percent of the security guards hired by Burns during the relevant period were African Americans.  (See Hirschl Decl. Ex. A).

Felder therefore has failed to make the required prima facie showing of racial discrimination both because he lacked the necessary qualifications and because the circumstances under which he was rejected do not give rise to an inference of discrimination.  Moreover, Securitas has posited a racially-neutral reason for its alleged decision not to hire Felder – namely, his failure to pass its screening test.  Felder has not shown that this reason for failing to hire him was a pretext, nor could he since most of the security guards hired for the temporary work that Felder sought were Black.

In these circumstances, Securitas should be granted summary judgment, and the Amended Complaint against Securitas should be dismissed.

2.    McRoberts

In the McRoberts action, Felder alleges that his former employer engaged in

both race discrimination and retaliation in violation of Title VII.  Felder has established the first three elements of his prima facie race discrimination case.  He is African American and therefore within the protected class.  Also, the fact that McRoberts hired Felder for a full-time security guard position at 502 Park Avenue suggests that he was qualified for the job.  (Crandell Aff. ¶ 13; Felder Dep. at 68).  Finally, it seems clear that he would have suffered an adverse employment action if, as he alleges, he was terminated.[3]  Thus, the critical question is whether Felder has shown that the adverse employment action occurred under circumstances giving rise to an inference of race discrimination.

Reading the Amended Complaint liberally, Felder contends that Dougherty and Rodriguez failed to establish at the administrative hearing that Felder had left his job at McRoberts voluntarily and therefore was not entitled to unemployment benefits.  (McRoberts Am. Compl. ¶ 8).  He further contends that Rodriguez lied to the Administrative Law Judge about her conversation with Felder on June 2, 2004.  (Id.).  Assuming that both of these allegations could be substantiated, they nevertheless fail to suggest that McRoberts discriminated against Felder on the basis of his race.  Indeed, it is undisputed that only days before Felder was fired, Dougherty had offered him a full-time position with McRoberts at 502 Park Avenue.  (See Felder Dep. at 68).

At his deposition, Felder was invited to elaborate on his race discrimination

---

[3]      The parties dispute whether McRoberts terminated Felder's employment against his will or he voluntarily abandoned his job.  (Compare Felder Dep. at 88-89, 93 with Crandell Aff. ¶ 22 & Ex. B).  For purposes of this motion, I have assumed that Felder was fired.

claim.  (Id. at 41).  He conceded that the only individuals at McRoberts who allegedly

discriminated against him were Dougherty and Rodriguez, and he complained that "[t]hey

didn't provide [him with] any type of paperwork or written documents."  (Id.).  Once

again, however, this conclusory assertion, even if true, in no way suggests that Felder was

the victim of racial discrimination.  Accordingly, Felder has failed to establish a prima facie

case of discrimination.[4]

       Moreover, even if Felder's prima facie showing were adequate, McRoberts

has proffered a racially neutral reason for its decision to fire Felder – namely, his failure to

comply with McRoberts' established call-off policy only days after Dougherty had

explained that policy to him.  Felder has failed to adduce any evidence whatsoever that this

reason is pretextual.

       Finally, at his deposition, Felder claimed that McRoberts discriminated

---

[4]     Felder also maintains that Rodriguez was "nasty" and that Dougherty was
"sarcastic" and "arrogant" during his conversations with them.  (Id. at 50, 79).  Nevertheless, he
admits that neither of them made any statements to him which were racially derogatory.  (Id. at
41).  Even if Rodriguez and Dougherty acted inappropriately, in the absence of any showing that
they were motivated by Felder's race, their conduct would not give rise to a Title VII claim.  See
Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (Title VII is not a "general civility
code"); Figueroa v. City of New York, No. 00 Civ. 7559 (SAS), 2002 WL 31163880, at *3
(S.D.N.Y. Sept. 27, 2002) (quoting Vore v. Indiana Bell Tel. Co., 32 F.3d 1161, 1162 (7th Cir.
1994) ("If the workplace is unsavory for any reason other than hostility generated on the basis of
race, gender, ethnicity, or religion, no federal claim is implicated.")); Caldwell v. ServiceMaster
Corp., 966 F. Supp. 33, 50 (D.D.C. 1997) (Title VII "does not guarantee employees a pleasant
work environment").

against Blacks because most of the greeters, who earned more money per hour than the guards, were white.  (Felder Dep. at 97).  Felder first raised this claim before the NYSDHR, which flatly rejected it, stating as follows:

> Complainant stated that at the BET Show, all the greeters were white, and since the greeters get paid more, whites were getting paid more.  Yet, he admitted that this isn't a standard practice because he saw multiple black greeters at the Gift Show in May.  The disparity in pay that he suggests in his complaint is not caused by any racially discriminatory motives, but rather is dependent on the position that is held.  Complainant himself was a greeter on several occasions, according to documentation provided by [McRoberts], and was paid the higher, corresponding wage.  Since there is no evidence that the higher paid greeter positions are reserved for whites, Complainant's claim, with regards to this issue, is without merit.

(Ekelman Aff. Ex. F at 2).  Felder has not adduced any additional evidence suggesting that this decision is wrong.

Felder also contends that McRoberts improperly retaliated against him.  (McRoberts Am. Compl. ¶ 4; Felder Dep. at 44).  At his deposition, apart from his complaints about the demeanor of Rodriguez and Dougherty, the only evidence that he cited in support of this claim related to the attempt to terminate him in April 2004, after his first alleged violation of McRoberts' call-off policy.  (See Felder Dep. at 44-51).  To establish a prima facie retaliation claim, however, Felder must show that he had engaged in some protected activity.  Here, by the time that McRoberts first sought to terminate Felder in April 2004, he had not engaged in any such protected activity.

21

In his Amended Complaint, Felder also alleges that he was subjected to retaliation on June 2, 2004, the date when he was scheduled to begin his new full-time job but once again called in at the eleventh hour to say that he would not be there.  As of that date, Felder had written a letter to McRoberts, in which he threatened to report the company to the Human Rights Division unless it complied with his demands.  (See Ekelman Aff. Ex. C).  Felder's letter also used the word "discrimination."  (Id.).  For these reasons, the sending of Felder's letter could reasonably be construed as protected activity. See, e.g., Jones v. Yonkers Public Schools, 326 F. Supp. 2d 536, 548 n. 13 (S.D.N.Y. 2004).

It furthermore seems clear that McRoberts was aware of Felder's letter. Indeed, shortly thereafter, McRoberts told Felder that there had been a "misunderstanding" and that he was not being terminated.  (Felder Dep. at 47).  Additionally, although McRoberts takes the position that Felder subsequently voluntarily left its employ by opting to care for his grandmother in South Carolina, Felder contends that McRoberts' Human Resources Manager told him in early June that he had been terminated.  If so, there also can be little question that he was the victim of an adverse employment action.

To prevail on his retaliation claim, however, Felder must also establish that there was a causal connection between his April 14 letter and his termination.  Here, no such showing has been made.  Indeed, there is no direct evidence that anyone at McRoberts had a retaliatory animus against Felder.  There also is no indirect evidence.  In

22

fact, it is undisputed that McRoberts gave Felder a permanent position <u>after</u> he sent his April 14 letter complaining about the purported termination of his temporary position. McRoberts also had hired Felder to work as a security guard and greeter on nearly a dozen occasions after the date of the April 14 letter.  (<u>See</u> Ekelman Aff. Ex. B).  Clearly, had McRoberts wanted to rid itself of Felder because he sent a letter threatening to file a discrimination complaint, it would have made no sense to have continued to employ him on a temporary basis and then transfer him to a full-time position.

At his deposition, Felder suggested another retaliation theory, claiming that Rodriguez testified falsely at the hearing before Administrative Law Judge Nicolato that he had telephoned her on June 2, 2004.  (<u>See</u> Felder Dep. at 49-50).  Felder, however, has not adduced any evidence to support this conclusory assertion, nor has he even explained why he contends that her testimony is false.  It is settled law that such unsupported allegations are insufficient to defeat a properly supported motion for summary judgment.  <u>See</u> <u>Lloyd v. Bear Stearns & Co., Inc.</u>, No. 99 Civ. 3323 (GBD), 2004 WL 2848536, at *7 (S.D.N.Y. Dec. 9, 2004) (citing <u>Fujitsu Ltd. v. Fed. Express Corp.</u>, 247 F.3d 423, 428 (2d Cir. 2001) (party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation") and <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998) (same)).

For these reasons, McRoberts is entitled to summary judgment with respect to Felder's employment discrimination and retaliation claims.

23

IV.     Conclusion

For the reasons set forth above, the defendants' motions for summary judgment should be granted.  Pursuant to 28 U.S.C. § 1915(a)(3), the Court also should certify that any appeal from the granting of those motions would not be taken in good

faith.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

V.      Notice of Procedure for Filing of Objections to this Report and Recommendation

         The parties are hereby directed that if they have any objections to this

Report and Recommendation, they must, within ten days from today, make them in

writing, file them with the clerk of the Court, and send copies to the chambers of the

Honorable Lewis A. Kaplan, United States District Judge, and to the chambers of the

undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York

10007, and to any opposing parties.  See U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e),

72(b).  Any requests for an extension of time for filing objections must be directed to

Judge Kaplan.  The failure to file timely objections will result in a waiver of those

objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:         New York, New York
               August 3, 2006

                                                     FRANK MAAS
                                              United States Magistrate Judge

24

Copies to:

Honorable Lewis A. Kaplan
United States District Judge

Sean Felder [Pro Se]
2579 8th Ave., Apt. D
New York, NY 10030

Felice B. Ekelman, Esq.
Jackson Lewis LLP
(212) 972-3213 (fax)

Claudia M. Cohen, Esq.
Epstein, Becker & Green, P.C.
(212) 661-0989 (fax)